IN THE UNITED STATES DISCTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY HALL,<br>Individually and on Behalf of<br>All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TELETRACKING TECHNOLOGIES, INC.,<br><br>Defendant. | CIVIL ACTION NO. 2:20-cv-1204<br><br>COLLECTIVE ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

## COLLECTIVE ACTION COMPLAINT

Plaintiff Gary Hall, on behalf of himself and all others similarly situated, seeks relief for former employees of Defendant TeleTracking Technologies, Inc. ("TeleTracking"), who were targeted and selected for layoff by TeleTracking because of their age and in violation of the Age Discrimination in Employment Act ("ADEA" – 29 U.S.C. §§ 621 *et seq.*).

## PRELIMINARY STATEMENT

1. On October 2, 2019, TeleTracking fulfilled its 18-month plan to purge the company of its oldest and/or disabled employees.

2. It is believed that this 18-month purge was devised, planned, and implemented by TeleTracking's senior leadership, which includes Chairman & Chief Executive Officer Michael Zamagias, President Christopher Johnson, and Chief Financial Officer Anita Dressel.

3. The goal of TeleTracking's 18-month purge was to fire the employees who it believed were too old; were too sick to continue working; or would soon experience a decline in their work performance because of their age and/or past medical history.

4. Achieving the purge required TeleTracking to resort to threats and deception to ensure that the scope of the 18-month plan would be kept secret and proceed without any opposition from current and former TeleTracking employees.

5. As described in further detail below, Plaintiff and approximately 44 former employees of TeleTracking were victims of the company's plan to remove its oldest employees from its payroll by October 2019.

## THE PARTIES

6. Gary Hall is an adult individual who resides at 216 B Grandview Ave., Monaca, Pennsylvania 15061.

7. TeleTracking Technologies, Inc. ("TeleTracking") is a for-profit corporation incorporated under the laws of Delaware with corporate headquarters in Pittsburgh, Pennsylvania.

8. At all relevant times, TeleTracking continuously employed more than 15 employees and was a covered employer as defined by the ADEA.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that Hall's claims arise under the laws of the United States and Hall seeks redress for violations of federal laws.

10. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that it is between citizens of different states, and the amount in controversy exceeds the sum of $75,000.00.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b)(2) as a substantial part of the events or omissions giving rise to Hall's claims occurred in this district at TeleTracking's headquarters in Pittsburgh, Pennsylvania.

## FACTUAL BACKGROUND

**A.** **TeleTracking and the Monetization of Patient Flow in the Healthcare Industry**

12. TeleTracking operates in the healthcare industry by assisting health care providers, hospitals, and medical centers to increase the efficiency in which they treat and discharge patients.

13. TeleTracking does not create any products or solutions which directly treat a patient. Instead, TeleTracking has monetized ways in which health care entities increase the efficiency in which existing patient care solutions are delivered.

14. Increasing the efficiency in which patients are treated and discharged is a measurable outcome and one that has helped to create the patient flow industry in which TeleTracking and its competitors operate.

15. While TeleTracking's business goals are simple, achieving those goals are not and require TeleTracking to create customized solutions for each of its clients.

16. TeleTracking relies on a multi-faceted approach, which includes, among other things, creation of inpatient tracking systems, analyzing existing patient data to determine ways in which patient care can be facilitated, and providing on-site consulting from TeleTracking employees.

17. In 2017, increased competition in the patient flow industry directly impacted TeleTracking and disrupted its relationships with existing and prospective clients. As a result, TeleTracking began to devise ways to cut operating costs within the company.

3

B. **TeleTracking's Purge of Its Oldest and Disabled Employees**

　　i. **Development of TeleTracking's Discriminatory Plan**

18.　It is believed that in 2017, TeleTracking began to develop a plan to cut costs by terminating the employment of its oldest and/or disabled employees ("Illegal Purge").

19.　TeleTracking believed that these old (i.e., age 40 and older) and/or disabled employees were too costly to continue employing and designed the Illegal Purge to replace these employees with cheaper, younger, and healthier individuals.

20.　TeleTracking also believed that these old and/or disabled employees would soon be too old and/or too disabled to continue providing value to the company.

21.　Upon information and belief, Johnson devised the Illegal Purge that would terminate the employment of TeleTracking's oldest and/or disabled employees.

22.　Upon information and belief, Johnson began implementation of the Illegal Purge after he became TeleTracking's President.

23.　Upon information and belief, Dressel assisted with the development and implementation of this Illegal Purge as TeleTracking's Chief Financial Officer.

24.　Upon information and belief, Zamagias approved the execution of this Illegal Purge as TeleTracking's Chairman, Chief Executive Officer, and owner.

　　ii. **Initial Implementation of TeleTracking's Illegal Purge**

25.　In March 2019, TeleTracking began executing the Illegal Purge by selecting the oldest and/or disabled employees for a voluntary retirement program ("VRP").

26.　Upon information and belief, the employees who were offered the VRP were among the oldest of TeleTracking's employees and were all over the age of 40.

27. Upon information and belief, many of the employees who were offered the VRP were disabled or regarded as disabled because they had taken medical-related leave within the past year.

28. While the VRP was labeled a voluntary program, its offerees were bullied and coerced into accepting the terms and conditions of the program. For example

   a. Several employees were told by Sue Wingert, TeleTracking's Human Resources Business Partner and Talent Manager, that if they refused to accept the VRP, they would be put on a performance improvement plan and fired.

   b. Some employees were told by TeleTracking that if they refused to accept the VRP, they would not be paid bonuses they had previously earned.

   c. Other employees were specifically told by TeleTracking that they had no other option but to sign the VRP.

29. Each of the VRP recipients was forced to sign a Confidential Separation Agreement and General Release ("Release Agreement").

30. The Release Agreement required the VRP recipients to waive, among other things, any claim that they might have under the ADEA.

31. While the Release Agreement contained certain notice provisions under the Older Workers' Benefit Protection Act ("OWBPA"), it failed to provide the VRP recipients with a complete and accurate list of other employees whose employment was considered for inclusion in the VRP ("decisional unit").

32. Upon information and belief, TeleTracking's failure to provide the VRP recipients with accurate information about the decisional unit was intentional and part of TeleTracking's Illegal Purge. As a result, TeleTracking's attempted waiver of those employees ADEA claims is void as a matter of law.

### iii. Completion of TeleTracking's Illegal Purge

33. On October 2, 2019, TeleTracking completed the Illegal Purge by laying off approximately 47 employees ("October Layoffs").

34. All but two of the October Layoffs involved employees who were age 40 and older ("Senior Employees").

35. The October Layoffs were a complete surprise to the Senior Employees as none of these employees were given advance notice that their employment would be terminated.

36. Some of the Senior Employees were notified of their layoff while meeting with clients.

37. Other Senior Employees were notified of their layoff while in the airport, traveling for work.

38. The October Layoffs also came as a surprise to a majority of TeleTracking's employees. In fact, nearly all the October Layoffs were conducted without consulting the Senior Employees' direct supervisors.

39. While TeleTracking's explanation for the October Layoffs varied, it is believed that none of the Senior Employees were chosen for the October Layoffs because of their work performance.

40. Nearly all the Senior Employees chosen for the October Layoffs were regarded as experts in their field.

41. Nearly all the Senior Employees chosen for the October Layoffs had received raises and exceptional performance reviews in 2019.

42. Upon information and belief, each of the Senior Employees were offered a Release Agreement which indicated that their job was being eliminated.

43. Upon information and belief, each of the Senior Employees received a Release Agreement which failed to comply with the OWBPA because the contract did not provide accurate information about the decisional unit for any of the Senior Employees.

44. In fact, many of the Senior Employees received a Release Agreement with incorrect, missing, and/or intentionally manipulated decisional unit information.

45. TeleTracking's intentional misrepresentation of the decisional unit information for the Senior Employees was done to ensure completion of TeleTracking's 18-month plan to purge the company of its oldest disabled employees. As a result, TeleTracking's attempted waiver of those employees ADEA claims is void as a matter of law.

C. **Improper Termination of Gary Hall's Employment**

46. Plaintiff Gary Hall was born on June 19, 1971.

47. In June 2004, Plaintiff was hired by TeleTracking as a Specialist to manage on-site transport tracking solutions for some of TeleTracking's clients.

48. Plaintiff quickly distinguished himself in the Specialist role and was assigned additional responsibilities, which included creating training materials for TeleTracking employees, supervising initial installs for TeleTracking's operations in the United Kingdom, and overseeing administrative training for TeleTracking's clients across the nation.

49. Over the next 15 years, Plaintiff performed his job duties at an exceptional level and received numerous accommodations and awards; was promoted frequently; received raises and bonuses every year that he was eligible; and was relied upon by his coworkers, managers, and clients for his expertise in the patient flow industry.

50. In 2019, Plaintiff was asked by TeleTracking to move into an analyst role in business analytics due to severe staffing issues in that department.

51. Plaintiff was assured by his supervisors that the move was positive and that his future with TeleTracking remained secure.

52. Plaintiff eventually made the transition to Analyst in June 2019.

53. Four months later, Plaintiff's employment was terminated as part of the October Layoffs.

54. The Release Agreement that Plaintiff received indicated that his job was eliminated as part of a company-wide restructuring. When Plaintiff inquired further, TeleTracking told him that the reason why he was chosen for the October Layoffs was because of past performance issues, lack of relevant experience, and deficiencies with certain technical skills.

55. It is believed that the stated reasons for the termination of Plaintiff's employment was pretext and that TeleTracking acted willfully and in reckless disregard of Plaintiff's rights under the ADEA when it targeted Plaintiff as part of the Illegal Purge because they believed that due to his age, he, along with the other Senior Employees, was or would be unable to perform the essential functions of his job.

56. Plaintiff, along with the other Senior Employees, however, was able to perform the essential functions of his job at all relevant times.

57. As a result of TeleTracking's discrimination, Plaintiff, along with the other Senior Employees, has suffered and will continue to suffer a substantial loss of earnings, including, but not limited to, loss of salary, bonuses, benefits, health insurance, life insurance, and other emoluments of employment.

58. As a further direct and proximate cause of TeleTracking's discrimination, the reputation and career of Plaintiff, along with the other Senior Employees, has been damaged.

**D.     Exhaustion of Administrative Remedies**

59.     On November 27, 2019, Plaintiff filed a Charge of Discrimination against TeleTracking with the Equal Employment Opportunity Commission ("EEOC"), alleging a pattern and practice of age discrimination by TeleTracking.

60.     Plaintiff's Charge of Discrimination was dual-filed with the Pennsylvania Human Relations Commission.

61.     This ADEA action may proceed under 29 CFR § 1626.18(b) because more than 60 days have passed since Plaintiff filed his Charge of Discrimination with the EEOC.

62.     Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## COLLECTIVE ACTION ALLEGATIONS

63.     Plaintiff brings this case as an ADEA collective action pursuant to 29 U.S.C. § 216(b), on behalf of himself and all other Senior Employees whose employment was terminated during Defendant's 18-month campaign to purge the company of its oldest employees.

64.     Collective treatment of Plaintiff's ADEA claim is proper because Plaintiff and other Senior Employees are "similarly situated" within the meaning of 29 U.S.C. § 216(b). A factual nexus exists between the manner in which Defendant's conduct affected Plaintiff and the manner in which Defendant's conduct affected other Senior Employees.

65.     Accordingly, Plaintiff's collective action claims derive from a single course of conduct by Defendant. The objective facts are essentially the same for Plaintiff and all other Senior Employees. Within each claim for relief, the same legal standards under federal law govern.

## COUNT I
Violations of the Age Discrimination in Employment Act
(On Behalf of Plaintiff and Similarly Situated Individuals)

66. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 65, as if fully set forth herein.

67. Plaintiff and other Senior Employees were over the age of 40 at the time their employment was terminated.

68. Plaintiff and other Senior Employees were able to perform the essential functions of their job at all relevant times.

69. Defendant discriminated against Plaintiff and other Senior Employees because it engaged in a pattern and practice of discriminating against individuals who were age 40 and older when it fired Plaintiff and other Senior Employees as part of the company's 18-month plan to purge its oldest employees.

70. The acts and omissions by Defendant that are described in this Complaint constitute unlawful discrimination under the ADEA.

71. As a proximate result of Defendant's conduct, Plaintiff and other Senior Employees have or will suffer substantial harm, for which they seek general, compensatory, and liquidated damages.

## COUNT II
Violations of the Age Discrimination in Employment Act
(On Behalf of Plaintiff and Similarly Situated Individuals)

72. Plaintiff incorporates by reference the allegations in Paragraphs 1 through 71, as if fully set forth herein.

73. Plaintiff and other Senior Employees were over the age of 40 at the time their employment was terminated.

74. Plaintiff and other Senior Employees were able to perform the essential functions of his job at all relevant times.

75. Defendant's plan to cut operating costs is facially neutral because it purports to apply to all employees in a consistent and fair manner.

76. Upon information and belief, Defendant's application and enforcement of its cost-cutting plan adversely impacted Plaintiff and other Senior Employees in a statistically significant way.

77. The disparity in which Plaintiff and other Senior Employees' employment was terminated is a violation of the ADEA.

78. As a proximate result of Defendant's conduct, Plaintiff and other Senior Employees have or will suffer substantial harm, for which they seek general, compensatory, and liquidated damages.

## REQUESTS FOR RELIEF

Accordingly, Hall requests that this Court enter judgment on behalf of himself and other Senior Employees and enter an order directing the award of other relief, as follows:

A. Declaring this action to be an ADEA collective action properly maintained under 29 U.S.C. § 216(b);

B. Entering an order requiring TeleTracking to provide Plaintiff the names, dates of birth, length of employment, and last known contact information, including physical addresses, e-mail addresses, and telephone numbers of all former TeleTracking employees from 2018-2019 who, at the time of their termination, were age 40 and older;

C. An order directing that notice and opportunity to opt-in be given to all former TeleTracking employees from 2018-2019 who, at the time of their termination, were age 40 and older;

D. Finding that TeleTracking violated the ADEA;

E. Awarding Plaintiff and other Senior Employees back pay, front pay, lost benefits, and other emoluments of employment and such other relief as is necessary to make them whole;

F. Awarding Plaintiff and other Senior Employees liquidated damages under the ADEA;

G. Awarding Plaintiff and other Senior Employees attorneys' fees and costs;

H. Awarding Plaintiff and other Senior Employees pre- and post-judgment interest as provided by law; and

I. Awarding Plaintiff and other Senior Employees any other relief to which they are entitled and/or which this Court deems necessary and proper.

Dated:

Respectfully submitted,

| **ANAPOL WEISS** | **EDGAR SNYDER & ASSOCIATES** |
|---|---|
| /s/ Sol H. Weiss | /s/ Sammy Y. Sugiura |
| Sol H. Weiss, Esquire (ID #15925) | Sammy Y. Sugiura, Esquire (ID #209942) |
| Paola Pearson, Esquire (ID # 318356) | |
| One Logan Square | U.S. Steel Tower, 10th Floor |
| 130 N. 18th St., Suite 1600 | 600 Grant Street |
| Philadelphia, PA 19103 | Pittsburgh, PA 15219 |
| 215-735-1130 (P) | 412-391-2101 (P) |
| 215-875-7701 (F) | 412-391-7032 (F) |
| sweiss@anapolweiss.com | ssugiura@edgarsnyder.com |
| ppearson@anapolweiss.com | |

**COUNSEL FOR PLAINTIFF**